UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 16-CR-10096-PBS |
| | ) | |
| CHRISTOPHER WILKINS | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT CHRISTOPHER WILKINS'S MOTION TO SUPPRESS ALL EVIDENCE DERIVED FROM TITLE III WIRETAPS ON TARGET TELEPHONES 9-17 AND INCORPORATED MEMORANDUM OF LAW

The Defendant, Christopher Wilkins, respectfully moves this Honorable Court to

suppress all evidence obtained from the Title III wiretaps of Target Telephones 9-17, as the

affiant failed to establish that the wiretaps were necessary as required by 18 U.S.C. § 2518(1)(c).

In support of this motion, Mr. Wilkins submits this memorandum of law.

## FACTS[1]

At some unknown time, the ATF, DEA, and local law enforcement agencies began an

investigation into the so-called "Chapman Drug Trafficking Organization" (the "Chapman DTO"

or the "DTO"), which agents believed distributed cocaine, fentanyl, and heroin to users and

lower-level dealers. Throughout the course of this investigation, agents sought and received a

total of seventeen wiretaps, the phones of which belonged to seven different people. The first of

these wiretaps, which was on Target Telephone (TT) 1, was sought on October 19, 2015.[2] The

warrant was approved by United States District Judge F. Dennis Saylor, IV on the same day.[3]

---

[1] These facts are taken from the varying affidavits in support of the applications for a wiretap warrant. These facts are merely allegations, and the defendant does not waive his right to contest any of the facts contained herein.
[2] *Affidavit in Support of Application for a Wiretap on Target Telephone 1*, at 78 (hereinafter "*Affidavit TT-1*").
[3] *Id.*

1

Interceptions began on October 20, 2015 and ended on November 12, 2015.[4] A wiretap was sought on TT-2 on November 6, 2015, which was approved by Judge Denise J. Casper the same day.[5] Interceptions began on November 6, 2015 and ended on November 20, 2015.[6] A wiretap was sought for TT-3 and approved by Judge Saylor on December 1, 2015.[7] Interceptions began on December 11, 2015 and ended on December 30, 2015.[8] A wiretap was sought for TT-4 and approved by Judge Saylor on December 10, 2015.[9] Interceptions began on December 11, 2016 and ended on December 30, 2015.[10] A wiretap was sought on TTs 5-8 and approved by Judge Saylor on January 11, 2016.[11] The interceptions on TT-5 ended on January 20, 2016, whereas the interceptions on TTs 6-8 ended on February 10, 2016.[12] The initial wiretap for TT-9 was sought and approved by Judge Saylor on January 29, 2016.[13] Interceptions began on January 29, 2016,[14] and an extension was sought - along with initial wiretaps on TTs 10-15 - and approved by Judge Saylor on February 24, 2016.[15] Interceptions began on February 25, 2016.[16] Agents then requested an extension for the wiretaps on TTs 11 and 15, as well as initial interception on TTs 16-17 on March 23, 2016.[17] Judge Saylor approved this warrant.[18]

---

[4] *Affidavit in Support of an Application for a Wiretap Warrant on Target Telephones 11, 15-17*, at 6 (hereinafter *Affidavit TT 11, 15-17*").

[5] *Affidavit in Support of an Application for a Wiretap Warrant on TT-2*, at 75 (hereinafter "*Affidavit TT-2*").

[6] *Affidavit TT 11, 15-17*, at 6.

[7] *Affidavit in Support of an Application for a Wiretap Warrant on TT-3*, at 93 (hereinafter "*Affidavit TT-3*").

[8] *Affidavit TT 11, 15-17*, at 6.

[9] *Affidavit in Support of an Application for a Wiretap Warrant on TT-4*, at 100 (hereinafter "*Affidavit TT-4*").

[10] *Affidavit TT 11, 15-17*, at 6.

[11] *Affidavit in Support of an Application for a Wiretap Warrant on TTs 5-8*, at 125 (hereinafter "*Affidavit TT 5-8*").

[12] *Affidavit TT 11, 15-17*, at 7.

[13] *Affidavit in Support of an Application for a Wiretap Warrant on TT-9*, at 111 (hereinafter "*Affidavit TT-9*").

[14] *Affidavit TT 11, 15-17*, at 7

[15] *Affidavit in Support of an Application for a Wiretap Warrant on TTs 9-15*, at 134 (hereinafter "*Affidavit TT 9-15*").

[16] *Affidavit TT 11, 15-17*, at 7.

[17] *Affidavit TT 11, 15-17*, at 112.

[18] *Id.*

At the time of the first wiretap application, investigators had identified eleven target subjects, seven of whom were "believed to be members of the Chapman DTO/Gang."[19] At the time that wiretaps were sought on TTs 9-15, investigators had identified thirty seven targets.[20] That number increased to forty by the time that investigators sought extensions on TTs 11 and 15 and an original interception on TTs 16-17.[21] In the final wiretap affidavit dated March 23, 2016, the affiant stated that "investigators are currently working with the United States Attorney's Office to prepare an indictment and execute search warrants on or about March 29, 2016."

In an effort to justify necessity for the wiretaps, the affiant set forth a number of goals, which remained constant throughout each of the wiretap applications. Specifically, the affiant stated:

> The goal of this investigation is to identify each of the members of the Chapman DTO/Gang, and to dismantle the Chapman DTO/Gang through successful arrests and prosecutions of all persons involved in their drug distribution, including their sources of supply. In addition, the goal of this investigation is to identify how the gang members and drug traffickers acquire and possess firearms in violation of Title 18, United States Code, Section 922(g)(1), and to identify and prosecute those supplying the gang with firearms, as well as the gang members themselves. Finally, the goal of this investigation is to develop evidence regarding the commission of the violent acts committed by the gang (such as murder and home invasion specified above) in order to potentially charge gang members under statutes such as [18 U.S.C. §§ 924(c) & 1959].[22]

The affiant's argument as to why a wiretap was necessary remained effectively the same in the affidavits for both TTs 9-15 and TTs 11, 15-17, all of which incorporated by reference the necessity arguments made in each prior affidavit. Prior to specifically describing why each normal investigative technique had failed or would be insufficient, the affiant stated that he "believe[s] that the interception of wire and electronic communications is the only available

---

[19] *Affidavit TT-1*, at 9.
[20] *Affidavit TT 9-15*, at 8.
[21] *Affidavit TT 11, 15-17*, at 7-8.
[22] *Affidavit TT-1*, at 48. *Compare Affidavit TT 9- 15*, at ¶ 161 (same).

technique to accomplish the investigation goal of dismantling the drug distribution network."[23] The affiant noted that undercover agents had not been utilized due to "the tight knit nature of the Chapman DTO," and the fact that the DTO "was attempting to 'lay low,'" making it impossible to introduce an undercover agent.[24] At the time of the application for wiretaps on TTs 9-15, agents had utilized seven confidential sources, one cooperating witness, and nine sources of information.[25] That number increased to eight confidential sources, two cooperating witnesses, and nine sources of information by the time that wiretaps were sought on TTs 11, 15-17.[26] The affiant noted that through these sources, investigators were able to receive "information concerning the narcotics trafficking and use of violence by a number of Target Subjects," and "several chargeable controlled purchases from Wilkins and Chisholm."[27] Yet since only the two cooperating witnesses were willing to testify, and they did not have any controlled purchases involving Chapman or Mello, the affiant concluded that "cooperating sources and informants are insufficient to achieve the goals of this investigation."

Investigators utilized a federal grand jury to issue "well over 60 subpoenas seeking evidence to use against members of the Chapman DTO."[28] Aside from the issuance of subpoenas, investigators did not otherwise utilize a grand jury under the belief that such an "investigation will [not] accomplish the goals of arresting and convicting the members of the Chapman DTO and their associates."[29] In support of that conclusion, the affiant stated that any suspects "would most likely invoke their Fifth Amendment privileges," or would otherwise not

---

[23] *Affidavit TT 9-15*, at ¶ 166. *See also Affidavit TT 11, 15-17*, at ¶ 105.
[24] *Affidavit TT 9-15*, at ¶ 167. *See also Affidavit TT 11, 15-17*, at ¶ 106.
[25] *Affidavit TT 9-15*, at ¶¶ 169-208.
[26] *Affidavit TT 11, 15-17*, at ¶¶ 108-146.
[27] *Affidavit TT 11, 15-17*, at ¶147. *See also Affidavit TT 9-15*, at ¶ 209.
[28] *Affidavit TT 11, 15-17*, at ¶ 150. *See also Affidavit TT 9-15*, at ¶ 212 ("well over 50").
[29] *Affidavit TT 9-15*, at ¶ 211. *See also Affidavit TT 11, 15-17*, at ¶ 149.

"provide credible information on the Chapman DTO."[30] In addition, a grand jury investigation "would likely alert other members of the Chapman DTO/Gang."[31] The affiant claimed that granting immunity would not be "appropriate at this time because these sources of information are reluctant to cooperate, and commencing interviews with federal investigators could cause them to stop providing information at this time."[32]

Investigators utilized several pen registers, which "have proven valuable, in that combined with physical surveillance, has allowed investigators to view meetings between [the target subjects]."[33] Investigators also "engaged in extensive physical surveillance on the Target Subjects since interceptions began on October 20, 2015."[34] Such surveillance was effective in that it allowed investigators to understand the DTO's *modus operandi*, "and has allowed investigators to seizure [sic] narcotics."[35] Notwithstanding the fact that "there is little doubt that surveillance is effective and important," the affiant rejected this investigative technique because "surveillance is most effective when it is utilized in conjunction with intercepted calls or text messages."[36]

Other surveillance techniques utilized by agents included the installation of pole cameras,[37] GPS tracking devices on vehicles,[38] GPS "ping" devices,[39] "triggerfish" warrants,[40] historical cell site data review,[41] text message search warrants,[42] and court orders for precise

---

[30] *Affidavit TT 1*, at ¶¶ 149-150 (incorporated by reference into later affidavits).
[31] *Id*. at ¶ 151.
[32] *Affidavit TT 9-15*, at ¶ 215. *See also Affidavit TT 11, 15-17*, at ¶ 153.
[33] *Affidavit TT 9-15*, at ¶ 218. *See also Affidavit TT 11, 15-17*, at ¶ 156.
[34] *Affidavit TT 9-15*, at ¶ 220. *See also Affidavit TT 11, 15-17*, at ¶ 158.
[35] *Affidavit TT 9-15*, at ¶ 220. *See also Affidavit TT 11, 15-17*, at ¶ 158.
[36] *Affidavit TT 9-15*, at ¶ 221. *See also Affidavit TT 11, 15-17*, at ¶ 159.
[37] *Affidavit TT 1*, at ¶ 169; *Affidavit TT 2*, at ¶ 140; *Affidavit TT 3*, at ¶ 170.
[38] *Affidavit TT 3*, at ¶ 171; *Affidavit TT 5-8*, at ¶ 234; *Affidavit TT 9*, at ¶ 193; *Affidavit TT 9-15*, at ¶ 223.
[39] *Affidavit TT 2*, at ¶ 141; *Affidavit TT 9*, at ¶ 193.
[40] *Affidavit TT 3*, at ¶ 171.
[41] *Affidavit TT 3*, at ¶ 171.
[42] *Affidavit TT 9*, at ¶ 193.

location information for telephones.[43] Pole cameras enabled "investigators to conclusively determine what phones Chisholm is using,"[44] and allowed investigators to "conduct covert physical surveillance without the risk of being discovered by the DTO."[45] Even though pole cameras "provide direct evidence of meetings and movements," the affiant claimed that they were only helpful during the day, and noted that they do not collect audio.[46] As such, he asserted, will not "on [their] own, achieve the goals and objectives of this investigation."[47] The affiant further noted that, although "ping" information "provide[s] a general geographic location of a particular cellular phone, it provides no information about the reason why a phone might be located in a particular area."[48] Thus, he claimed that pings "will not fully achieve the goals of this investigation ... [unless] paired with electronic and wire interceptions."[49]

In addition, tracking warrants allowed "investigators to conduct close physical surveillance,"[50] and triggerfish warrants allowed investigators "to determine what phone numbers both Chapman and Chisholm are using."[51] Moreover, the "purpose of the historical cellsite order is to determine whether Chisholm has a stash house in Orleans/Truro area that he has been to in the past."[52] In rejecting all three of these investigative techniques, the affiant asserted that "despite the ability to track and monitor persons such as Chisholm, Wilkins and Chapman, which lets investigators readily conduct surveillance, without wire and electronic

---

[43] *Affidavit TT 9-15*, at ¶ 223.
[44] *Affidavit TT-3*, at ¶ 170.
[45] *Affidavit TT 5-8*, at ¶ 234.
[46] *Affidavit TT*-1, at ¶ 169-170.
[47] *Affidavit TT-1*, at ¶ 170.
[48] *Affidavit TT-1*, at ¶ 172.
[49] *Id*.
[50] *Affidavit TT 5-8*, at ¶ 234.
[51] *Affidavit TT-3*, at ¶ 171.
[52] *Affidavit TT-3*, at ¶ 171.

interceptions, investigators do not have any context for the surveillance, which is critical to developing a sufficient indictment against the members of the Chapman DTO."[53]

In the early stages of the investigation, trash searches were "[n]ot feasible," according to the affiant, since residents "are required to take their trash to the town dump and personally dispose of [it]."[54] Even though this concern did not apply to Chapman since his trash is picked up curbside, the affiant "believe[d] it is too risky to attempt to conduct a trash search," since that trash is placed in a well-lit area in front of his house.[55] Notwithstanding those concerns, investigators were able to discover "heroin cutting agents in the trash of Molly London, which has allowed investigators to determine that she had active awareness of the heroin storage operation run by Chisholm at her house."[56]

Agents also conducted a financial investigation, which included issuing subpoenas for financial documents.[57] According to the agent, "[s]ome of the information obtained has proven fruitful," including learning the location of a bank account in Wilkins's wife's name and a safety deposit box used by Greene.[58] However, the affiant stated that "even with these records evincing suspicious deposits, without linking that cash to narcotics sales, it will be difficult to bring money laundering charges against [the targets]."[59]

In the final wiretap application for TTs 11, and 15-17, the affiant noted that "investigators have developed sufficient evidence to charge multiple members of the Chapman DTO with narcotics crimes."[60] He then noted that investigators planned to "execute search warrants on

---

[53] *Affidavit TT 5-8*, at ¶ 235.
[54] *Affidavit TT 1*, at ¶ 173.
[55] *Affidavit TT-1*, at ¶ 174.
[56] *Affidavit TT 11, 15-17*, at ¶ 165.
[57] *Affidavit TT 11, 15-17*, at ¶ 169.
[58] *Affidavit TT 11, 15-17*, at ¶ 169.
[59] *Id*.
[60] *Affidavit TT 11, 15-17*, at ¶ 103.

March 29, 2016 at locations associated with the Chapman DTO."[61] Despite that, he believed that

"real-time intelligence as gleaned through the wire and electronic interceptions of the prime

targets of this investigation" is necessary to ensure that the warrants "develop sufficient useful

information to prosecute people such as Chapman and Mello."[62]

## DISCUSSION

**I.   THE AFFIDAVIT IN SUPPORT OF WIRETAPS ON TTS 9-17 FAILED TO
SATISFY THE NECESSITY REQUIREMENT AS THE GOALS OF THE
INVESTIGATION HAD ALREADY BEEN SATISIFED, AND IN ANY
EVENT, WERE OVERLY BROAD.**

The goals of the investigation had been accomplished as of the time that wiretaps were

sought on TTs 9-15, and certainly no later than the time that wiretaps were sought on TTs 11,

and 15-17. As a result, additional wiretaps were not necessary. To the extent that any of the

investigative goals were not fully accomplished, those goals were overly broad and calculated to

manufacture necessity.

In enacting Title III, "Congress sought to protect the privacy of wire and oral

communications" by making the interception of those communications "an extraordinary

investigative technique whose use 'is to be distinctly the exception - not the rule.'" *United States

v. Lopez*, 300 F.3d 46, 51 (1st Cir. 2002) (quoting *United States v. Hoffman*, 832 F.2d 1299, 1306

(1st Cir. 1987)); s*ee also Gelbard v. United States*, 408 U.S. 41, 48 (1972) (noting that one of the

dual purposes of Title III is "protecting the privacy of wire and oral communications."). Indeed,

in creating the Act, Congress intended to "make doubly sure that the statutory authority [for

wiretaps] be used with restraint and only where the circumstances warrant the surreptitious

interception of wire and oral communications." *United States v. Giordano*, 416 U.S. 505, 515

(1974).

---

[61] *Id.*
[62] *Affidavit TT 11, 15-17*, at ¶ 167.

In furtherance of these "privacy-centered purposes," *United States v. Gonzalez*, 412 F.3d 1102, 1111 (9th Cir. 2005), Congress "impose[d] a number of strict requirements on the issuance and use of wiretap warrants." *Lopez*, 300 F.3d at 51 (citing *Giordano*, 416 U.S. at 515). One of those is known as the necessity requirement, which obligates the government to provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c).

As a result of the "statutory preference for less intrusive techniques," the necessity requirement mandates that the government undertake "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls." *Hoffman*, 832 F.2d at 1306-07. The Supreme Court has noted that mandating a necessity showing is "designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12 (1974). Indeed, the necessity requirement imposes a "statutory presumption against granting a wiretap," which the government must overcome. *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985) (citing *Giordano*, 416 U.S. at 515).

While it is not "an exhaustion requirement," necessity does require that the government "show with specificity why ordinary means of investigation will fail; conclusory statements without factual support are not sufficient." *Lopez*, 300 F.3d at 52-53; *see also United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989) (government cannot satisfy its burden with "bare conclusory statements that normal techniques would be unproductive"); *United States v.*

*Castillo-Garcia*, 117 F.3d 1179, 1194 (10th Cir. 1997) ("generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application.").

Here, the investigative objectives had been accomplished at the time that the wiretaps were sought on TTs 9-15, and certainly, at the very latest, by the time that wiretaps were sought on TTs 11, and 15-17. Since a wiretap cannot be issued after the time that the investigative goals have been accomplished, the wiretaps on TTs 9-17 were not necessary. To the extent that the investigative goals were not fully accomplished at that time, they were overly broad and improperly calculated to manufacture necessity.

A.     **At the Time That Wiretaps Were Sought on TTs 9-17, the Investigative Goals Set Forth in the Affidavit Had Already Been Accomplished, Rendering the Wiretap Unnecessary.**

The affiant's investigative goals had been fully accomplished at the time that the wiretaps were sought on TTs 9-15, and certainly no later than the time that wiretaps were sought on TTs 11, and 15-17. Where a showing of necessity has been made for the issuance of a wiretap, "interceptions must cease once the objective of the warrant has been achieved." *United States v. Cellini*, No. 08 CR 888-4, 2009 WL 2601335, at * 5 (N.D. Ill. Aug. 21, 2009). *See also* 18 U.S.C. 2518(5) ("No order entered under this section may authorize or approve the interception of any wire, oral, or electronic communication for any period longer than is necessary to achieve the objective of the authorization"); Once the objectives of the investigation have been completed, a further wiretap cannot be justified on the basis that agents want to discover additional evidence. *Cellini*, 2009 WL 2601335, at *5 ("further investigation to improve prosecution evidence is too broad a standard to be consistent with the objectives of Title III"). *See also United States v. Martinez*, 452 F.3d 1, 4 (1st Cir. 2006) (a wiretap may only issue if the court has "satisf[ied] itself that the government has ... encountered difficulties in penetrating a

criminal enterprise or in gathering evidence - to the point where (given the statutory preference for less intrusive techniques) wiretapping becomes reasonable.") (citing *United States v. Abou–Saada,* 785 F.2d 1, 11 (1st Cir.1986)).

In analyzing the necessity requirement where multiple applications are contained in a single affidavit, "each application must be evaluated separately to determine if each satisfies the necessity requirement." *United States v. Duarte*, No. 14-CR-00296-JST-1, 2016 WL 97440, at * 76 (N.D. Cal. Jan. 8, 2016). *See also United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988) ("*Each* wiretap application, standing alone, must satisfy the necessity requirement."); *United States v. Brone*, 792 F.2d 1504, 1507 (9th Cir. 1986) ("The government may not dispense with the statutory mandated showing of necessity to obtain a wiretap [of one conspirator's] telephone despite the validity of the wiretap of his co-conspirator's telephone."); *United States v. Chavez*, No. 12-CR-241-IEG, 2013 WL 692097, at * 2 (S.D. Cal. Feb. 25, 2013) ("Each wiretap application must satisfy the necessity requirement as to each telephone."); *United States v. Velarde-Ozuna*, No. CR 10-754-TUC-CKJ, 2011 WL 507918, at *4 (D. Ariz. Oct. 20, 2011) ("the necessity requirement must be independently satisfied with respect to each new individual whose conversations are to be intercepted.").

Here, the goals of the investigation had been fulfilled by the time that a wiretap was sought on TTs 9-15; certainly this was true, at the very latest, when the wiretap was sought on TTs 11, and 15-17. To the extent that the goal of obtaining sufficient evidence to successfully prosecute *all* of the target subjects had not been fully accomplished at the time that the wiretaps were sought on TTs 9-15, investigators had no reason to believe that further wiretaps on TTs 9-10 and 14-15 would help to accomplish those goals, and thus those particular wiretaps were unnecessary.

###### i.    The goals of the investigation had been satisfied by the time a wiretap was sought on TTs 9-15.

The main goal of the investigation was to "identify each of the members of the Chapman DTO/Gang."[63] Yet at the time that wiretaps were sought on TTs 9-15, investigators had identified thirty-seven target subjects, and there was no evidence that any additional members of the DTO had been left unidentified. Moreover, the goal was to identify members of the DTO, *not* to sweep up as many individuals who purchase narcotics from the DTO as possible. Indeed, as long as drugs are illegal, there will always be dealers and users left unidentified, and so the mere fact that agents were continuing to learn the identity of individuals who purchased from the DTO, but who were not members, cannot justify indefinite wiretaps on identified dealers. Barring any evidence that there were additional members of the DTO who were not yet identified, the goal of "identify[ing] each of the members of the Chapman DTO/Gang" had been accomplished at the time that wiretaps were sought on TTs 9-15.[64]

Another goal of the investigation was to successfully prosecute all of the members of the DTO.[65] Yet investigators had more than sufficient evidence to obtain a conviction against these target subjects at the time that the warrant on TTs 9-15 was sought. To the extent that investigators did not have sufficient evidence to convict *each and every one* of the thirty-seven target subjects, such a failure does not render the wiretaps on TTs 9-10 and 14-15 necessary, since the investigators had more than sufficient evidence to convict the users of the phones that were being intercepted. Whereas there had already been wiretaps on Wilkins's, Chisholm's, and Chapman's phones for substantial periods of time, agents had no reason to believe that further wiretaps on TTs 9-10 and 14-15 would provide any additional, necessary evidence that they had

---

[63] *Affidavit TT 9-15*, at 96.
[64] *Affidavit TT 9-15*, at 96.
[65] *Affidavit TT 9-15*, at 96-97.

not yet discovered. As such, even if agents did not have sufficient evidence to prosecute each of the thirty-seven target subjects, additional wiretaps on TTs 9-10 and 14-15 were not necessary to achieve that goal since they were not reasonably likely to help agents achieve it.

Moreover, as noted above, there will always be dealers and users left unidentified. Agents cannot continually add new target subjects to a wiretap application - and assert that they do not have enough evidence to convict those target subjects - in order to justify indefinite wiretaps on targets for whom they have more than enough evidence to successfully prosecute. Since "*[e]ach wiretap application, standing alone, must satisfy the necessity requirement,*" *Carneiro*, 861 F.2d at 1176, the fact that the goal of obtaining sufficient evidence to convict each of the thirty-seven target subjects may not have been fully accomplished cannot render the wiretaps on TTs 9-10 and 14-15 necessary.

Even if a wiretap on some of the target subjects would have been necessary, agents had already uncovered substantial evidence against Wilkins, Chisholm, and Chapman. Although the amount of evidence that had been obtained was so substantial that it cannot be readily outlined here, a brief summary of that evidence demonstrates that these later wiretaps were superfluous. At the time that the wiretap was sought on Wilkins's TT-10, agents had already conducted six controlled purchases from Wilkins, and had intercepted countless calls on both his TT-6 and TT-7, as well as on Chisholm and Chapman's prior wiretaps.[66] Agents also had evidence to show that Wilkins picked up his resupply in New Bedford.[67] Analysis of pen register data revealed substantial contact with a number of target subjects.[68] In addition, agents intercepted several phone calls which showed that Wilkins obtained cocaine from Jason Mello.[69]

---

[66] *Affidavit TT 9-15*. at 21. For more detail on three of those controlled purchases, *see Affidavit TT 9-15*, at 73-79.
[67] *Affidavit TT 9-15*, at 65-69.
[68] *Id*. at 84-86
[69] *Affidavit TT 9-15*, at 79-83.

At the time that an extension was sought on Chisholm's TT-9 and original interception was sought on Chisholm's TT-14, investigators had intercepted countless calls on his TT 3, 5, and 9. Through the combination of physical surveillance and wiretap interceptions, agents had sufficient evidence to prove that Chisholm "distributes heroin on Cape Cod to other dealers,"[70] and that he "collects narcotics from individuals associated with the United Barbershop in New Bedford."[71] Intercepted phone calls revealed deals conducted between Chisholm and Shaun Miller, Brooke Cotell, Tyrone Gomes, Oliver Hamilton, Tara McCorkle and other target subjects.[72] Analysis of pen register data revealed substantial contact with a number of target subjects.[73] In addition, agents had evidence that Chisholm "acts as an enforcer ... and he uses firearms and violence to further the drug trafficking activities."[74] Agents also had evidence to show that Chisholm picks up his resupply in New Bedford.[75]

At the time that the wiretap was sought on Chapman's TT-15, agents had likewise amassed significant evidence against him, which "confirmed that Chapman distributes heroin on Cape Cod to other dealers ... and that Chapman coordinates his heroin distribution with co-conspirators."[76] For example, wiretap interceptions revealed that Chapman distributes narcotics to Chisholm and Jason Greene.[77] Analysis of pen register data revealed substantial contact with a number of target subjects.[78] Interceptions further showed that he "maintain[ed] a drug stash

---

[70] *Affidavit TT 9-15*, at 20.
[71] *Affidavit TT 9-15*, at 48. *See also Id*. at 65-69.
[72] *Id*. at 48-62.
[73] *Id*. at 91-92
[74] *Affidavit TT 9-15*, at 20.
[75] *Affidavit TT 9-15*, at 65-69.
[76] *Affidavit TT 9-15*, at 19.
[77] *Affidavit TT 9-15*, at 61-64.
[78] *Id*. at 92-96.

house at 18 Bodfish Place in Hyannis, MA.[79] Agents also had evidence that Chapman picks up his resupply in New Bedford.[80]

In sum, agents had more than substantial evidence to successfully prosecute Wilkins, Chisholm, and Chapman. The affiant's assertion that a wiretap was necessary because agents did not have any "chargeable controlled purchases" from either Chapman or Chisholm is baseless.[81] They had ample evidence to charge both Chapman and Chisholm with conspiracy. Moreover, since agents did not need a wiretap to conduct controlled purchases, an additional wiretap was unlikely to provide investigators with any evidence that they did not already have.

Furthermore, agents had no reason to believe that continued wiretaps would help them achieve the additional goals of this investigation, namely "to identify how the gang members and drug traffickers acquire and possess firearms ... and to identify and prosecute those supplying the gang with firearms."[82] Prior wiretaps on Wilkins's phones lasted for thirty-one days, prior wiretaps on Chisholm's phone lasted for just under two months, and prior wiretaps on Chapman's phones lasted for over two months. If agents had not yet intercepted any calls which would help them achieve these goals, they had no reason to believe that such calls would be forthcoming on continued interceptions. To the extent that this goal was not already accomplished, additional wiretaps were unlikely to achieve it.

### ii. The goals of the investigation had certainly been satisfied by the time that a wiretap was sought on TTs 11, 15-17.

At the time that wiretaps were sought on TTs 11, 15-17 on March 23, 2016, the investigation had essentially come to a close. The affiant noted as much by stating that "investigators have developed sufficient evidence to charge multiple members of the Chapman

---

[79] *Id*. at 64-69.
[80] *Affidavit TT 9-15*, at 65-69.
[81] *Id*. at 115.
[82] *Affidavit TT 9-15*, at 97.

DTO with narcotics crimes."[83] Because they had accomplished the stated investigative goals of identifying the members of the DTO and acquiring sufficient evidence to successfully prosecute them, investigators were "currently working with the United States Attorney's Office to prepare an indictment and execute search warrants on or about March 29, 2016."[84]

In order to justify these final wiretaps - since all of the other goals had been accomplished - the affiant noted that "[c]ontinued interception of all four telephones (11, 15-17) will help investigators achieve the goals of this investigation, maximize seizures of narcotics, and link the target subjects to these seizures."[85] Yet such a goal does not comport with the intent of Title III to "make doubly sure that the statutory authority [for wiretaps] be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *Giordano*, 416 U.S. at 515. In addition, it violates the rule that no additional wiretaps shall be issued after the goals of the investigation have been satisfied, *Cellini*, 2009 WL 2601335, at *5, and after wiretaps have "suffice[d] to expose the crime." *Kahn*, 415 U.S. at 153 n. 12. Since "improv[ing] prosecution evidence is too broad a standard to be consistent with the objectives of Title III," this goal cannot justify a wiretap. *Cellini*, 2009 WL 2601335, at *5.

Moreover, even if it were a proper goal, it is clear that investigators did not utilize the wiretaps on TT 11, 15-17 for this purpose. Aside from a bag containing an unknown quantity of suspected marijuana at Chapman's house at 2 Roberta Drive, no narcotics were discovered during the execution of any of the search warrants on the homes associated with Chisholm, Chapman, and Mello, and virtually nothing was found in Wilkins' home. This fact casts doubt on the affiant's assertion that continued interception was truly necessary just days prior to the conclusion of the investigation.

---

[83] *Affidavit TT 11, 15-17*, at ¶ 103.
[84] *Affidavit TT 11, 15-17*, at 46.
[85] *Affidavit TT 11, 15-17*, at 46.

By the time of the last affidavit, the number of target subjects had increased to forty, and there was no reason to believe that there were any additional members of the DTO left unidentified. To the extent that sufficient evidence to successfully prosecute Chisholm had not been fully developed at the time that the wiretap was sought on TTs 9-15, it certainly had been by the time this final wiretap was sought. At that point, investigators had conducted four chargeable controlled purchases of heroin from him,[86] and further interceptions led to additional evidence.[87]

The wiretaps on TTs 11 and 15 were both extensions, and TTs 16 and 17 were the 5th wiretaps on Chisholm's and Chapman's phones, respectively. Given the existence of prior wiretaps for substantial periods of time on these suspect's phones, agents had no reason to believe that more wiretaps would lead to any additional, necessary evidence that they had not already discovered.

### B.   To the Extent that the Investigative Goals Set Forth in the Affidavit Were Not Fully Satisfied, They Were Overly Broad for the Purpose of Manufacturing Necessary.

To the extent that any of the goals set forth by the affiant were not completely satisfied, those goals were overly broad and cannot be used to manufacture necessity. "The government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances." *United States v. Blackmon*, 273 F.3d 1204, 1211 (9th Cir. 2001). Indeed, the government may not set "broad objectives" in order to render an otherwise unnecessary wiretap necessary. *United States v. Landeros-Lopez*, 718 F.Supp.2d 1058, 1066 (D. Ariz. 2010). Broad objectives which do not establish necessity include "a desire to find and successfully prosecute all members" of the organization, and "a desire to obtain substantial information about the

---

[86] *Affidavit TT 11, 15-17*, at 49-54.
[87] *See e.g. Affidavit TT 11, 15-17*, at 54-56, 61, 64-69, 74-76.

organization's techniques, methods, and practices." *Id.* at 1067 (citing *Blackmon*, 273 F.3d at 1211). Indeed, the mere assertion that a conspiracy is "tough to crack" with traditional investigative methods is insufficient to establish necessity since such a rule would only require the government to show a probability that an illegal conspiracy is afoot in order to satisfy the necessity requirement. *United States v. DiMuro*, 540 F.2d 503, 511 (1st Cir. 1976), (quoting *United States v. Kalustian*, 529 F.2d 585, 589 (9th Cir. 1976)).

The Ninth Circuit in *Blackmon*, 273 F.3d at 1210, suppressed wiretap evidence on the basis that the affidavit made "only general allegations that would be true in most narcotics investigations." The court held that the investigative purpose set forth by the affiant - namely, to "identify all the participants in this cocaine trafficking organization and to result in the successful prosecution of these individuals" - was overly broad. *Id.* The court took particular issue with the affiant's statements regarding confidential informants, pen registers, and search warrants. Specifically, the fact that informants "typically only possess limited knowledge concerning the scope of the criminal enterprise" was insufficient to establish necessity because "these statements would be true of most or all drug conspiracy investigations." *Id.* Similarly, the assertion that pen registers do not "show[] the identity of the callers or the nature or purpose of those communications ... is nothing more than a description of the inherent limitations of these devices." *Id.* More is required in order to satisfy the necessity requirement. *Id.*

The court similarly rejected "boilerplate assertions" about the limitations of search warrants and witnesses since they "would be true of most if not all narcotics investigations." *Id.* The court summarized its holding by noting that the mere presence of generic problems often associated with complex investigations does not suffice to show necessity:

> That pen registers do not reveal the identity of callers; that drug dealers know it is in their best interest to reveal as little as possible; that witnesses cannot lead to the

prosecution of an entire drug organization; and that traditional investigative methods do not reveal all are generic problems of police investigation. Their generic nature does not dissipate simply because the government claims a vast investigative purpose.

*Blackmon*, 273 F.3d at 1211.

Here, the affidavit was strikingly similar to the one rejected by the Ninth Circuit in *Blackmon*. The affiant set forth extraordinarily broad investigative goals such that even a permanent wiretap was unlikely to fully achieve them. While the affiant went to great lengths to discuss the relative success of each normal investigative technique, his assertions regarding necessity were vague and "bare conclusory statements." *Ashley*, 876 F.2d at 1072. Yet intermingling factual statements about the success of normal investigative techniques with conclusory statements of necessity is far from sufficient to satisfy the "factual support" requirement discussed in *Lopez*, 30 F.3d at 52-53. The factual limitations that the affiant did set forth regarding confidential informants, pen registers, and search warrants were nearly identical to those expressly rejected by the court in *Blackmon*, 273 F.3d at 1210-11.

Since he could not set forth the proper factual showing of necessity, the affiant instead attempted to justify interception by creating the broadest possible investigative goals. For example, one of the goals of the investigation was to "identify and prosecute those supplying the gang with firearms" and narcotics.[88] The problem with this goal, however, is that it can never be achieved, even with a wiretap. Had the investigators discovered the Targets' source of supply, they nonetheless would have needed a wiretap, according to their logic, to discover *that person's* source. So the argument goes; until such time as the investigators discover the coca grower in Columbia or the poppy grower in Afghanistan - or wherever else they may be - there will always be a source left undiscovered. To the extent that investigators had not discovered the targets'

---

[88] *Affidavit TT 9-15*, at ¶ 161.

19

source of supply for firearms, they had no reason to believe that additional wiretaps would help discover that information. As the Ninth Circuit articulated in *Blackmon*, "the government may not cast its investigative net so far and so wide as to manufacture necessity in all circumstances." *Blackmon*, 273 F.3d at 1211. Yet that is precisely what happened here.

Furthermore, the courts have previously rejected the other goals set forth by the affiant in this case as being overly broad. For example, the affiant's desire to ascertain "how the gang members and drug traffickers acquire and possess firearms" has been held to be overly broad. *See e.g. Landeros-Lopes*, 718 F.Supp.2d at 1067 ("a desire to obtain substantial information about the organization's techniques, methods, and practices ... supported only by a discussion of generic shortcomings in traditional law enforcement techniques, does not establish necessity under *Blackmon*.").

In addition, while perhaps admirable, the affiant's desire to "identify each of the members of the Chapman DTO/Gang, and to dismantle the Chapman DTO/Gang through successful arrests and prosecutions of all persons involved in their drug distribution, including their sources of supply" is overly broad and cannot be used to justify necessity. *See e.g. Blackmon*, 273 F.3d at 1210 (affiant's goal "to identify all the participants in this cocaine trafficking organization and to result in the successful prosecution of these individuals for their full involvement in this criminal enterprise" was overly broad). The fact that it may be difficult to identify all members of a conspiracy by normal investigative techniques is insufficient to justify necessity, as that would allow a wiretap wherever the affiant believes that a conspiracy exists. *DiMuro*, 540 F.2d at 511.

The goals of the investigation set forth by the affiant in order to justify necessity were overly broad and calculated to "manufacture necessity in all circumstances," *Blackmon*, 273 F.3d at 1211. Thus, the affidavit failed to satisfy the necessity requirement.

## CONCLUSION

For the reasons set forth above, this Honorable Court must suppress all of the fruits of the illegal wiretaps on TTs 9-17.

Respectfully Submitted,
CHRISTOPHER WILKINS
By his attorney:

/s/ Michael Tumposky
Michael Tumposky
(BBO No. 660618)
Hedges & Tumposky, LLP
50 Congress St., Suite 600
Boston, MA 02109
T) (617) 722-8220
F) (617) 507-8116

## CERTIFICATE OF SERVICE

I, Michael Tumposky, hereby certify that on this 17th day of February, 2017, I served one true and correct copy of this motion, where unable to do so electronically, on all counsel of record in this matter.

/s/ Michael Tumposky
Michael Tumposky