UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION No. 16-CR-10096 |
| v. | |
| DENZEL CHISHOLM, | |
| Defendant | |

GOVERNMENT'S SENTENCING MEMORANDUM

On September 18, 2015, Christine Ferreira was viciously murdered at a rest stop on the side of Route 6 in Hyannis, MA. Evidence collected by investigators soon after the murder pointed to Defendant Denzel Chisholm ("Defendant") as her assailant. From this, the federal investigation into the large-scale heroin trafficking of Denzel Chisholm and others took shape, and by mid-October 2015, investigators began the wiretap of Chisholm's drug trafficking organization ("Chisholm DTO"). This investigation ultimately led to 19 federal arrests and 18 convictions. The sole remaining Defendant, Bethanne Hutchings, faces a competency hearing in late September.

As this Court is well-aware, only two of the defendants proceeded to trial – Defendant and his accomplice, Molly London. Both were convicted. Defendant was convicted of every charge against him except for possession of a firearm by a felon. The time has now come to assign punishment to Defendant for being one of the most prolific heroin traffickers in Cape Cod

history. The Government, by William D. Weinreb, Acting United States Attorney, and Eric S. Rosen and Miranda Hooker, Assistant United States Attorneys for the District of Massachusetts, files this sentencing memorandum on behalf of the Government. As set forth below, the Government asks this Court to sentence Defendant to **420 months of imprisonment**.

## FACTUAL OVERVIEW

**A. Massachusetts, and Cape Cod in particular, is in the midst of an unprecedented and horrific opiod epidemic.**

1. A nearly two-week trial took place before this Court involving Defendant and his co-conspirator Molly London, who allowed Chisholm to store heroin in her apartment. As this Court is well-aware, and as the Court has frequently made clear at the sentencing of Defendant's co-conspirators, the heroin trafficking conspiracy of which Defendant was a member and a leader was an extensive and sophisticated operation that distributed large quantities of heroin on Cape Cod.

2. Drug trafficking is frequently portrayed as a victimless crime. However, the statistics paint a very different story.[1] The Massachusetts Department of Public Health website has compiled detailed statistics on how heroin trafficking effects the citizens of this Commonwealth, and these statistics show that heroin trafficking is deadly. In fact, 2,069 people in the Commonwealth of Massachusetts suffered from opioid-related deaths in 2016 alone.[2] 72 percent of those who died were male, and 28% were female. The majority of the people who died were between 25 and 44 years old; 596 of the dead were between 25 and 34 years old. This number has expanded dramatically over the past few years. In 2010, "only" 560 died in this

---

[1] Under the first 3553 factor (18 USC 3553), this Court "shall consider" the "nature and circumstances of the offense."

[2] http://www.mass.gov/eohhs/docs/dph/stop-addiction/current-statistics/data-brief-overdose-deaths-may-2017.pdf

manner.  In 2011, 656 died, in 2012, 742 died, in 2013, 961 died, in 2014, 1,361 died, and in 2015, 1,793 died from opiod overdoses.  Most notably, the rate of opiod-related deaths increased from 8 per 100,000 residents in 2010 to 30.5 per 100,000 residents in 2016, which is a nearly 400% increase over a period six years.  Simply put, the heroin epidemic shows no signs of abatement.

3. Barnstable County, which has a population of only 215,000 people, has been particularly hard-hit.  In 2011, 19 residents of Barnstable County died from opiod-overdoses.  In 2015, when the conspiracy involving Defendant was at its peak, 71 residents of Barnstable County died.  That number has only continued to grow, with an estimated 78 residents of Barnstable County dying from opiod overdoses in 2016 (36 deaths per 100,000 residents).  Within the town of Barnstable itself (population 45,000), 13 individuals died from opiod overdoses in 2015, and 22 died in 2016 (48 deaths per 100,000 residents).  In addition to actual deaths, the statistics paint an even more dire picture when non-fatal overdoses are taken into account.  In 2015, during the height of the Nauti-Block gang's heroin trafficking success, emergency personnel responded to 314 opiod related incidents in the town of Barnstable alone.  Notably, this number dropped to "only" 252 in 2016 (after the Nauti-Block gang was largely eliminated).

4. That Cape Cod has been devastated by the heroin epidemic has not gone unrecognized.  The Barnstable County Regional Substance Abuse Council estimates that 3.1% of Barnstable County residents are heroin or opiod addicts.[3]  This same report found that substance abuse in Barnstable County had an annual direct cost of $110 million, and a cost to law enforcement of nearly $57 million.  Drug treatment costs in 2013 alone were over $51 million.

---

[3] http://www.bchumanservices.net/library/2015/03/RSAC-Baseline-Report-FULL-REPORT-3-11-15-Final.pdf

Moreover, the report estimated that for every $1 in direct costs, $3.5 dollars were lost in productivity costs. Thus, the productivity costs due to substance abuse on Cape Cod were $355 million in 2013.

5.  The media – both local and national – has also recognized the devastation inflicted upon Cape Cod. In the winter of 2015/2016, HBO put out a documentary special called "Heroin: Cape Cod, USA" that looked at heroin addiction (focusing on eight young addicts) on Cape Cod.[4] The documentary chronicled how Cape Cod had evolved from an idyllic summer vacation spot to a peninsula dominated by drug trafficking and crime. Other news organizations, notably the Boston Globe, have published articles documenting heroin use and trafficking on Cape Cod, and the toll it has inflicted on local communities. As an example, on May 28, 2016, the Boston Globe published an article detailing how opiod-addicted women were giving birth to opiod-addicted babies on Cape Cod at a significant rate.[5] In Hyannis, a startling 3.8 to 5.8 percent of all deliveries involved babies born into the world already addicted to opiates. In addition to the obvious trauma inflicted upon the infant, the Government notes that the article makes clear the real financial cost that this addiction has on the hospitals (and, conversely, the general public). Newborns with neonatal abstinence syndrome cost an average of $66,000 to treat, with 80% of that paid for by taxpayer funded Medicaid. Far from being a "victimless crime," opiod-addiction affects everyone in the community: addicts, families and taxpayers.

6.  As the Court is aware, Massachusetts is not alone in confronting the opiod epidemic. The New York Times has estimated that 59,000 to 65,000 residents of the United

---

[4] http://www.hbo.com/documentaries/heroin-cape-cod-usa
[5] https://www.bostonglobe.com/metro/2016/05/28/cape-cod-hospital-copes-with-influx-drug-dependent-newborns/HqhDUI6vrEf5eNNGro07HL/story.html

States died in 2016 from opiod overdoses.[6]  This number far exceeds peak car crash deaths in 1992, peak HIV deaths in 1995, and peak gun deaths in 1993.  Simply stated, the opiod epidemic is real and it is intensifying, and against that background, the Government recognizes the need to punish people, such as Defendant, who knowingly and intentionally sell the drugs *into their own community* that are killing so many people.

> **B. Denzel Chisholm played a major role in distributing heroin and other narcotics to other dealers and drug users on Cape Cod.**

7. As the Court learned at trial, Denzel Chisholm's criminal activity knew no bounds.  The evidence that led to Defendant's conviction is largely set forth in the pre-sentence report ("PSR"), and the Government will not rehash the entirety of that evidence here.  However, it is important to note, for sentencing, a number of factors that have led to the Government's decision to ask for a sentence of 420 months.  These factors are as follows:

    a. The trial evidence showed that Defendant distributed large quantities of heroin on a near daily basis to other drug dealers, knowing that these dangerous narcotics, which included fentanyl, would be sold on to users.  There is a reason that Stephanie Davis described Defendant as the biggest drug dealer that she knew, and that is because, as the witnesses at trial explained, Defendant was one of the largest most prolific drug dealers on Cape Cod.

    b. Defendant also, on occasion, distributed drugs to drug addicts.  However, Defendant generally did not do that for profit.  As the Court can recall, Defendant used drug addicts such as Stephanie Davis and Chas Sexton to store and package heroin.  Defendant, who did not want to take the time to blend his own heroin, employed Davis and Sexton to mix large quantities of heroin with sleeping pills on his behalf.  Defendant provided these addicts with heroin in exchange for their services.  Even worse, Defendant traded drugs to addicts in

---

[6] https://www.nytimes.com/interactive/2017/06/05/upshot/opioid-epidemic-drug-overdose-deaths-are-rising-faster-than-ever.html?_r=0

exchange for sexual favors.  Some examples of these "sex-for-drugs" exchanges are set forth in paragraphs 252 to 256 of the PSR.  In his objections to the PSR, Defendant now minimizes this conduct and fails to take responsibility, claiming that he only "requested" sexual favors from addicts.  However, a review of the telephone calls show that these addicts would do anything – including providing oral sex to Defendant – to obtain more heroin to feed their addictions.  Simply stated, Defendant found these women at the lowest points of their lives and remarkably found yet another way to degrade them even further.  As ATF Special Agent John Hayes will explain at sentencing, with one victim, the telephone calls indicated that Defendant would not even provide the victim with free heroin; rather, the sexual favors were simply the price of "admission."  Defendant still charged this victim for the heroin that he provided to her.

   c.  Defendant conducted the entirely of this crime while on post-imprisonment probation for a prior felony drug trafficking and firearms conviction.  Further, as the telephone calls indicate, Defendant violated his probation because the heroin that he was mixing for distribution was absorbed into his skin and resulted in a positive drug test.  For this violation, Defendant was forced to wear a GPS bracelet.  Nonetheless, Defendant kept dealing large amounts of heroin, showing that no amount of law enforcement intervention could dissuade him from working diligently to destroy his own community.

   d.  Defendant did not sell drugs to feed his own drug or alcohol addiction.  Indeed, the PSR incredibly notes that Defendant "has never consumed alcohol and never tried any controlled substances."  Rather, the record is clear that Defendant engaged in his criminal conduct entirely for profit, spending his money on rental cars, trips, strip clubs and area casinos.  Likewise, Defendant cowardly used loved ones to further his criminal activity.  As examples, Defendant had Eelyese Mateo, the mother of his child, collect and deliver heroin on his behalf.

Defendant further employed other girlfriends to rent vehicles for him, which he used to evade law enforcement detection.

  e.  Defendant provided narcotics to Browning Mejia, who was in prison at the time of this offense. As the Court is aware, Christine Ferreira testified against Mejia in 2011 in state court, resulting in his conviction for a shooting. Mejia was sentenced to approximately a decade in prison, and it was due to Ferreira's testimony in that case that she was murdered in 2015. Not content to simply destroy Cape Cod, Defendant decided to branch out and ship suboxone into the MCI-Norfolk prison to assist his old friend Mejia. Mejia, who had bribed a corrections officer, then sold the suboxone on to other inmates. Defendant obtained this suboxone by trading heroin for the drug.

  f.  Defendant sold heroin and fentanyl knowing that these narcotics were causing people to overdose. At trial, the Court heard evidence of two drug overdoses. First, the Court heard Stephanie Davis describe how on March 12, 2016, she purchased a substance that she later learned was fentanyl from Denzel Chisholm. Notably, this drug deal took place at the home of Bethanne Hutchings. Davis then went home and shared the narcotic with her boyfriend, Chas Sexton. The testimony at trial showed that Sexton immediately overdosed and had to be revived by Narcan. Davis then warned Chisholm that the narcotics he sold her were far too strong. That warning came too late for Hutchings. That same night, the evidence at trial showed that Chisholm left heroin for Hutchings at her home. This led to her overdose. As Police Officer Corey Frederickson described at trial, he found Hutchings in her home that night suffering from a serious non-fatal overdose. Nor did Chisholm show any remorse for nearly killing Hutchings and Sexton. Rather, Chisholm used these overdoses to charge a higher price for these narcotics as illustrated in a March 15, 2016 recorded conversation that Chisholm had with Darrel Pelland:

CHISHOLM: But yeah fuckin yeah I still got a whole bunch of that shit let so once I get rid of that I'll have some better shit.
PELLAND: Have you had it tested … the good shit?
CHISHOLM: I had it tested. 100% dope, but it's gonna be little bit more you can probably one and one that …
PELLAND: How much more is that?
CHISHOLM: 400.
PELLAND: Oh for real? That's not too bad.
CHISHOLM: What's it called um.. it's some fentanyl shit.
PELLAND: That's what it is?
CHISHOLM: Yeah it's fentanyl shit.
PELLAND: That keeps them coming back quicker.
CHISHOLM: It's just like straight white powder that shit… when like when I dye it like I didn't even think it was gonna you know what I'm saying… I only got like a sample to test it out it's definitely dope.. It's white powdery.. I got a good amount. **I tested it on like four people, every one of them went out.**
PELLAND: They all went out.
CHISHOLM: I gave it to this fuckin bitch that like be blowing me up all the time.

As Pelland testified at trial, the term "four people … every one of them went out," referred to four people that overdosed on the fentanyl that Chisholm sold. Accordingly, Defendant knew that his narcotics were hurting people, but he intentionally sold these narcotics at a higher price to increase his profit margin.

  g. Finally, Defendant was heavily involved in obtaining illegal guns to provide to other drug dealers. As the Court is aware, the Government presented evidence at trial of a gun recovered from a vehicle parked on Chisholm's property. The outside wrapping of this firearm had Chisholm's fingerprint on the gun. Serriello has also told investigators that he purchased five or six firearms from Chisholm, including an AR-15 and a .357 Sig Sauer. Further, the jury heard telephone calls at trial where Chisholm was attempting to obtain firearms from co-conspirators in order to provide those firearms to Pelland.

  **C. Defendant has a Sentencing Guidelines offense level of 42, which results in a Guidelines range of 360 to Life.**

8. Other than disputing who is or who was a girlfriend, Defendant does not contest much of the PSR. The Government will, however, address the few objections that affect the

8

Sentencing Guidelines calculation here. The Government is not advocating for a two-level enhancement for bribing a law enforcement officer.

9. First, Defendant asserts that he only distributed one to three kilograms of heroin (offense level of 30) and not three to 10 kilograms (offense level of 32). Defendant presents no actual argument for why probation incorrectly calculated the amount of heroin, nor is this surprising given that the evidence at trial showed beyond any doubt that Defendant distributed at least three kilograms of heroin.

10. In that regard, the PSR provides for an uncontested baseline amount of 2.227 kilograms of heroin. That amount is based on drug seizures and wiretaps alone. Paragraph 272 then explains that numerous witnesses testified at trial and elsewhere, and these witnesses described large quantities of heroin (100s of grams at a time) that they either purchased from Defendant or packaged for Defendant. At minimum, this results in a heroin weight of at least three kilograms, and, in fact, the correct amount is most likely far higher. This witness testimony has been corroborated by: wiretap calls and intercepts, car rental receipts and records, casino spending and tax returns that show no legitimate income, and Chisholm's purchases of large quantities of heroin cut, such as Mannitol. Clearly, Chisholm is responsible for at least three kilograms of heroin, if not more than 10 kilograms of heroin. At sentencing, Special Agent Hayes will provide additional summary testimony concerning the drug weight applicable to Defendant.

11. Finally, Defendant objects to a four-level role enhancement for leadership, asserting that a "2-level enhancement is more appropriate." The Sentencing Guidelines make clear, however, that a four-level increase is warranted. Under Sentencing Guidelines Section 3B1.1, subsection (a), a Defendant's base offense level is increased by four points if he was an

"organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Under subsection (b), a two level increase is mandated if a defendant was simply an "organizer, leader, manager or supervisor in any type of criminal activity not covered by subsection (a) or (b). Here, there is little doubt that this massive DTO led by defendant involved well in excess of five participants.

12.     In that regard, Defendant's criminal activity involved more than a dozen people, and Defendant was a leader and organizer of this criminal activity. The Court heard much of this evidence at trial, and Agent Hayes will offer additional supplementary testimony at sentencing. To briefly summarize this testimony:

a.      Defendant was a true leader of his heroin trafficking organization. Defendant was a heroin supplier to numerous other co-conspirators, including Tyrone Gomes, Oliver Hamilton, Richard Serriello, Brooke Cotell, Chris Wilkins, Jason Mello, Frankie Cunha, Sean Pratt and Shaun Miller. This alone entitles him to a four-level enhancement. Defendant obtained the heroin, and then he helped mix, package and sell the heroin on to others. Often Defendant "fronted" the heroin on to his customers, thereby evincing his leadership role within the organization.

b.      Defendant stored his narcotics at the homes of Eelyese Mateo, Bethanne Hutchings and Molly London. Defendant frequently used Mateo to deliver drugs on his behalf, and he regularly conducted drug deals from the homes of London and Hutchings. Defendant further used London to purchase "cutting" items such as Mannitol for him in order to avoid law enforcement detection. Defendant also sold drugs from the home of Christopher Wilkins.

c.      Defendant had multiple girlfriends rent cars for him in their names, and Defendant used these cars to shield themselves from law enforcement. In addition, Defendant

used co-conspirators such as Davis, Sexton and Hutchings to test heroin on his behalf in order to ascertain the strength of this heroin.

        d.      Chas Sexton and Stephanie Davis testified that they stored drugs on behalf of Defendant, Christopher Wilkins and Christian Chapman.  In addition, these same defendants mixed and pressed heroin at their residence.  Defendant, together with others, kept a press at this home, and he also provided Sexton and Davis with heroin cutting material (primarily sleeping pills), which they then used to cut the heroin provided by Defendant.  Simply put, Defendant employed Sexton and Davis to do his dirty work for him.

       13.     Accordingly, Defendant's offense level can be properly calculated as follows:

        a.  Base offense level of 32 for distributing three to 10 kilograms of heroin;

        b.  Two-level increase for distributing suboxone within a prison (uncontested);

        c.  Two-level increase for maintaining stash houses (uncontested);

        d.  Four-level increase for being an organizer/leader of criminal activity that involved five or more people; and,

        e.  Two-level increase for employing a pregnant woman (Mateo) and committing the offense as part of a pattern of criminal conduct (uncontested).

        **f.  Total offense level: 42**

       14.     With respect to Defendant's criminal history, he does not appear to dispute that, at the very least, he has a Criminal History Category (CHC) of IV, given that he has seven criminal history points.  An offense level of 42 and a CHC of IV provides for a Guidelines Range of 360 months to life.

15. Defendant does contend that because one of his qualifying convictions – a Massachusetts conviction for possession of marijuana with the intent to distribute – is classified as a misdemeanor in Massachusetts, he should receive a downward departure in his criminal history category pursuant to "Application Note 4" to USSG Section 4B1.1.

16. Application Note 4 provides that in a case where "one or both" of the two prior felony convictions is based on an offense that was classified as a misdemeanor, "application of the career offender guidelines may result in a guideline range that substantially overrepresents the seriousness of the defendant's criminal history or substantially overstates the seriousness of the instant offense. In such a case, a downward departure may be warranted."

17. As an initial matter, it is clear that Application Note 4 cannot apply here because the career offender guidelines have no effect on Defendant's actual guidelines range. In that regard, Application Note 4 applies *only* where the career offender provision causes the guidelines range to increase substantially. Here, based on the fact that Defendant is at an offense level of 42, his guidelines range is 360 to life regardless of whether he has a CHC of I or a CHC of VI. Thus, on its face, Application Note 4 is inapplicable as the career offender provisions have no effect on Defendant's sentence.

18. Moreover, even if the career offender guidelines did effect Defendant's sentencing guidelines range, Defendant does not merit a downward departure in his criminal history category. The events that played out at trial show that Defendant truly is a career criminal. As the PSR reflects, Defendant served a substantial prison sentence from 2010 to 2014 for trafficking oxycodone and for possession of a firearm. After serving his sentence, Defendant immediately went back out and became an even bigger criminal, distributing massive quantities of heroin. In addition, Defendant's work history is minimal, at best, and Defendant does not

contest that he distributed heroin as part of a pattern of criminal conduct engaged in as a livelihood. Indeed, during this entire case, law enforcement never saw him do any legitimate work, and instead, as the PSR reflects, he simply sold heroin to fund his family and lifestyle. Defendant's career, until April 5, 2016, was drug trafficking. As such, no downward departure for criminal history is advisable, regardless of whether one of his convictions was a state court misdemeanor.

**D. A prison sentence for Defendant of 35 years is a just and appropriate sentence.**

19. Defendant's sentencing guidelines range is 360 months to life imprisonment. The Government is seeking a sentence of 35 years of imprisonment because Defendant is a violent criminal who has single-handedly wrecked the lives of many and who shows no prospects for reform.

20. It is nearly impossible to overestimate the damage that Defendant has done to Cape Cod. As the Court is aware, Cape Cod has been a true epicenter of the opiod epidemic over the past five years. HBO has made a movie about heroin use and abuse on Cape Cod, and Massachusetts Public Health statistics point to Cape Cod as having one of the highest overdose rates (on a per capita basis) in the Commonwealth. The "Nauti-Block" gang, led by Defendant, Christian Chapman and Christopher Wilkins, contributed significantly to this epidemic. Simply put, Defendant is the poster-child for heroin trafficking on Cape Cod, and he should be punished in accordance with his role.

21. As noted, Defendant sold his heroin and fentanyl primarily to other dealers. When Defendant sold heroin to drug addicts, it was primarily because he wanted something other than money in return. With Davis, Hutchings and Sexton, Chisholm wanted helpers to package and mix his drugs. With others, as described, Defendant wanted sex. Further, Defendant appeared to keep track of the overdoses that his narcotics caused, and he used those

overdoses to increase the price of the drugs he sold.  Some drug dealers are at such a high-level that they can plausibly argue that they did not know the effects that their narcotics would have on users.  Defendant, although very high-level, cannot make that argument.  Defendant knew the damage that his narcotics caused to others and he used that to his advantage.

22. Moreover, this was not Defendant's first-time in the criminal justice system. Since Defendant was a juvenile he has been committing crimes.  Most notably, in March 2010 Defendant was convicted of trafficking oxycodone, the precursor to heroin, as well as possession of a firearm.  The facts as set forth in the PSR suggest that Defendant possessed 200 grams of oxycodone, multiple guns, scales and cash.  For his crimes, Defendant was sentenced to five to seven years in prison and also given eight years of probation.  Defendant was 18 years old at the time of his crime.

23. Defendant should have used his time in prison to educate himself and reform. Defendant should have used his time to grow out of his youthful criminal activity.  Once released, Defendant should have used his probation to continue on the straight and narrow and return to becoming a contributing member of society.  Instead, Defendant simply became a better criminal.  What is so remarkable about Defendant's crimes is that he committed the entirety of these crimes while on probation.  In fact, the entire wiretap here took place while Defendant wore a GPS bracelet.

24. In effect, Defendant did not repeat, during this case, the mistakes that resulted in his conviction in 2010.  Indeed, Defendant no longer stored narcotics or firearms at his home. Instead, Defendant used others.  Defendant used his lovers - people like Eelyese Mateo - and he used his friends - people like Molly London.  Indeed, even after finding out that Mateo was pregnant with his own child, Defendant still employed Mateo to store heroin and distribute

heroin on his behalf. Defendant took people such as Mateo, who were not traditionally criminal, and Defendant turned them into criminals to shield <u>himself</u> from law enforcement. Defendant's destruction went far beyond the people he sold drugs to, and it extended to those who looked up to Defendant as a friend or as a potential partner.

25. Finally, as this Court is aware, there are two major state court cases pending against Defendant. First, Defendant faces an upcoming trial for the murder of Christine Ferreira. Investigators have compiled extensive evidence confirming Defendant's involvement in this brutal crime. This evidence includes Defendant's blood found on the body of Ferreira, as well as other forensic evidence and witness statements that place Defendant at the scene of the crime. Second, even after his arrest on both the murder and the federal drug charges, Defendant continued his reign of violence by viciously assaulting a corrections officer inside Barnstable County Jail (Paragraph 299 of the PSR). This attack was captured on video. The Government believes, from conversations with the District Attorney's Office, that Defendant will soon plead guilty to this offense in exchange for a five-year sentence. Accordingly, in addition to being a major narcotics distributor, Defendant also stands accused of committing multiple violent acts.

26. In short, the Government asks this Court, with this sentencing, to send a clear and stern message. Large-scale heroin trafficking on places like Cape Cod, where a defendant has actively worked to destroy his own community, will not be tolerated by a just and civil society. A lengthy sentence is needed not only to protect society from Defendant, but to deter other drug dealers from engaging in the same conduct. Accordingly, the Government respectfully requests a sentence of 35 years of imprisonment.

Respectfully submitted,

WILLIAM D. WEINREB
ACTING UNITED STATES ATTORNEY

By: /s/Eric S. Rosen
ERIC S. ROSEN
MIRANDA HOOKER
ASSISTANT UNITED STATES ATTORNEYS
617/748-3412

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed on ECF and copies will be further be distributed via e-mail to the registered participants.

/s/Eric S. Rosen
Eric S. Rosen
Assistant United States Attorney

Date: September 10, 2017